John C. Mabbach, J.
The issue is whether, pursuant to a collective bargaining agreement, a municipal corporation may make payments to a Teamsters Union Health and, Welfare Fund which in turn purchases various insurance plans for the municipal employees.
This court finds that it may.
Plaintiff has moved for summary judgment pursuant to the terms of collective bargaining agreements between the parties dated December 2, 1969 (covering blue collar workers) and December 16, 1969 (covering office workers). The agreement provided that payments were to be made by the town to Teamsters Local No. 456 Welfare Fund for the purchase by the trustees of the fund of insurance plans providing employee benefits including medical and dental, hospital, eyeglass and life insurance benefits. This fund is a trust fund established and administered by employer and union trustees under the trust plan pursuant to provisions of the Taft-Hartley Law (U. S. Code, tit. 29, § 186) and article 3-A of the Insurance Law.
Defendant has refused to make payment since January 1, 1970, .relying on opinions of the State Comptroller. These opinions (70-762 dated Sept. 16, 1970; '704)55 dated July 23, 1970; and in particular 70-426 dated May 27, 1970) advised the town that there was no authority to establish a trusteed welfare plan for the employees of a municipal corporation. Throughout this period from January 1, 1970 to the present time, the trustees of the fund have continued to make the premium payments in order to maintain these insurance policies. As of the date of the complaint of the action (Oct., 1970), the amount owed to the fund was about $20,000, computed for the period of time between January 1, 1970 and October, 1970. Needless to say, substantially more is now owed.
The teamsters’ position is that they have a contractual right to these payments; payments have been made by other municipal bodies to funds such as this; the town has the power by law to make such a payment; and such payments are impliedly sanctioned by public policy considerations.
The town relies on the opinions of the State Comptroller indicated above, in particular 7(1426 of May 27, 1970, which state *647 that the town lacks the authority to make the agreed-to payments.
Because of its importance, the court will include the complete text of the Comptroller’s opinion 70-426. Of course, however helpful and informative the opinion of the Comptroller is in any given situation (and they have been of inestimable assistance to both the Bench and Bar), the opinion of the Comptroller is not binding on a court.
opinion no. 70-426
“general municipal law, § 92-a(2); § 93(2): A boces may not agree with a union to participate in the union’s municipal employees’ insurance program.
INQUIRY
May a board of cooperative educational services agree with a union representing its employees to participate in the union’s group life, health and medical insurance program?
STATEMENT OP LAW
We would initially note that the insurance program to which the union proposes that the board of cooperative educational services (boces) contribute is entitled ‘ Westchester Teamsters Local 456 Municipal Employees Insurance Program ’. It must be recognized that a boces is not a municipal corporation and its employees are not municipal employees. We are not in a position to state, as a matter of law, what effect the inclusion of non-municipal employees in the municipal employees insurance program would be. Such a determination would have to be made based on the terms of the insurance policy in question.
In 24 Op. State Compt. 878, 1968, this Department was presented the question of whether a boces could pay a retiring employee for accumulated unused sick leave. We stated that: ‘General Municipal Law, § 92, does not apply to a board of cooperative educational services, since such public corporation is not a municipal or a district corporation. However, in our opinion, the board of cooperative • educational services may grant the same and similar benefits under its general corporate power (General Corporation Law, § 14(5), but such corporate power must be consistent with the statutory power granted to the school districts so that the legislative and public policy which grants benefits to school districts, municipal and other corporations is consistent with the regulation and grant of benefits by a boces.’
In 23 Op. State Compt. 316 (2nd case), at page 320, we discussed whether a school district could agree to pay a union $125 per employee for a dental plan, supplementary health plan, and for group life insurance. We note that school districts have the authority to purchase medical, surgical and hospital insurance (General Municipal Law, § 92-a(2)) and group life insurance (General Municipal Law, § 93). However, we stated that: ‘We find nothing in either section of the General Municipal Law, as above quoted, which would authorize the payment of moneys for the prescribed purposes to an employees’ union by this school district, nor can we, by any stretch of the imagination, conclude that such union is within the class of entities authorized under Insurance Law Article 9-c. Further, we do not believe that any such arrangement with such union could be deemed a “ contract ” or “ plan ” within the intended meaning of General Municipal Law, § 92-a and § 93(2).
In effect, the proposal in question would be tantamount to the school district’s treating the union as an insurance company and paying over district moneys *648 to such a union for the latter to hold, invest or use in whatever way it chooses. We find absolutely no authority for this.’
Thus, in 23 Op. State Compt. 316, supra, we stated our opinion that a school district could not pay over funds to a uniop for the union to purchase insurance for its members. ' Under the reasoning expressed in 24 Op. State Compt. 878, supra, we must conclude that, since a school district would not be authorized to enter into such a plan, the boobs likewise is not authorized to do so.
CONCLUSION
A boobs may not agree with a union to participate in the union’s municipal employees insurance program.
May 27, 1970 ”.
Opinion No. 70 — 426 (1970) relies in part on 24 Op. St. Comp. 878 (1968) and 23 Op. St. Comp. 316, which are included in their relevant section in the opinion quoted above. Summarized, these two opinions seem to state that school districts would not pay over funds to a union for the union to purchase insurance (23 Op. -St. Comp. 316); a boces cannot pay a retiring employee for accumulated unused sick leave (24 Op. St. Comp. 878 [1968]); and, therefore, a boces cannot agree with a union to participate in the union’s municipal employees’ insurance program since a boces and school districts should be controlled by similar legislative and policy considerations. The conclusion that these payments are not a ‘ ‘ contract ” or 11 plan ’ ’ and the conclusion that these payments would be tantamount to treating the union as an insurance company ignore the stated public policy behind article 3-A of Insurance Law which specifically authorizes payments by employers to a union welfare fund and the public policy provisions stated and inherent in the Taylor Law (Civil Service Law, art. 14). This is understandable in light of the Comptroller’s functions but is a narrow and restrictive interpretation of the statutes.
In granting the motion for summary judgment, the court relies on analogous cases of recent vintage, plus the public policy of this State as expressed in the applicable statutes.
I
PRECEDENT
There is no reported case in point. It is quite true that no judicial precedent authorizes such a payment although it has been stated in an affidavit by plaintiff’s secretary-treasurer that such payments are being made by school districts in Westchester County, in the Cities of New Rochelle, Mount Vernon and Yonkers without joint trustees, and in New Rochelle’s case with the specific knowledge of the Comptroller. It is further stated that the City of New York makes payment of a specified sum directly to a union fund as does the Board of Education, and *649 plaintiff also contends that the Comptroller of the City of New York has authorized payments directly to welfare funds such as plaintiff’s. No proof has been submitted to indicate under what charter provisions or other authority such payments are being made, but the defendant has not attempted in any way to refute these contentions.
Underlying the case law in this area are the basic constitutional provisions of article VIII (§ 1) of our New York State Constitution. This provision was intended to curb raids on the public purse for the benefit of favored individuals or enterprises furnishing no corresponding benefit (Matter of Mahon v. Board of Educ. of City of New York, 171 N. Y. 263 [1902]; Matter of Burton v. City of Albany, 40 Misc 2d 50 [Sup. Ct., Albany Co., Cooke, J., 1963]). Extra compensation is compensation over and above that fixed by contract or by law when the services were rendered (Matter of Burton v. City of Albany, supra; Lecci v. Nickerson, 63 Misc 2d 756 [Sup. Ct., Nassau Co., Oppido, J., 1970]). The principle prohibiting gifts of public moneys has evolved down through the years; see, e.g., People ex rel. Waddy v. Partridge (172 N. Y. 305) (1902) (payments by a municipality for pensions and allowances for public employees constitute advantage which must attach to present employment); see, also, the article V (§ 7) constitutional amendment of 1938 which provides that any ‘ ‘ membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired see, also, Brown v. New York State Teachers Retirement System (19 N Y 2d 779). This amendment recognized and secured a contractual right of public employees by constitutional mandate.
The law has developed to the point where the courts of this State now recognize that when a municipality grants pensions, vacations or military leave, it is not conferring a gift on its employees but is compensating the employee as one of the terms and conditions of employment, in some cases withheld, or deferred until the completion of continued and faithful service (Matter of Teachers Assn. [Bd. of Educ.], 34 A D 2d 351 [2d Dept., 1970]; Matter of Giannettino v. McGoldrick, 295 N. Y. 208 [1946]; Henn v. City of Mt. Vernon, 198 App. Div. 152 [2d Dept., 1921]; Herreboudt v. Board of Educ. of Peekskill City School Dist., 41 Misc 2d 547; Anderson v. Board of Educ. of Peekskill City School, 5 Misc 2d 1056; Hoyt v. County of Broome, 285 N. Y. 402 [1941]; cf. Matter of Carr v. Roesch, 231 App. Div. 19, 24-25, affd. 255 N. Y. 614). “ Terms and conditions of employment ” *650 is defined in the Civil Service Law (¡§ 201, subd. 4) as salaries, wages, benefits, etc. This court finds that an employee’s terms and conditions of employment include health and life insurance benefits.
The evolution of the law in this area and some of the cases referred to above have been chronicled in the persuasive opinion of Mr. Justice Hopkins in the analogous case of Matter of Teachers Assn. (Bd. of Educ.) (34 A D 2d 351, supra). Writing for the 4-1 majority, Mr. Justice Hopkins found that the payment by a school district of accumulated unused sick leave to a deceased teacher’s estate was constitutionally permissible. The court held that sick leave is a condition of employment, a form of compensation; see, also, Harryman v. Rosenburg Fire Dist. (244 Ore. 631 [1966]). This court finds that there are equal, if not greater, reasons for finding that medical, dental and life insurance premiums constitute terms or conditions of employment. are in fact a form of present compensation (People ex rel. Waddy v. Partridge, supra) and are even a more recognizable form of compensation than payment for accumulated unused sick leave benefits. In many areas of employment in today’s society, when one speaks of the so-called benefits of employment, one is also referring to medical, dental and life insurance benefits, not only for the individual employee but also for the members of his family. This is not a new idea. It is a concept that has been increasingly recognized by all types of employers, both public and private, as an integral part of the employment package and a valuable tool in recruiting and keeping personnel on all levels. It appears that in contracting with plaintiff to provide a broad range of benefits to its employees, the defendant recognized the importance of these benefits to its employees’ total compensation package.
One further point on this subject should be made. It is clear that a municipality may directly contract with any insurance company authorized to do business in the State for the purpose of furnishing medical and surgical services (General Municipal Law, § 92-a).
This is also the law in several other States; see e.g., Riddlestorffer v. Rahway (82 N. J. Super. 36 [1963]), where the New Jersey Superior Court held such payments constitutional, legal and not ultra vires. Such payments are for a public purpose and are not an attempt to give or lend public money to aid a private enterprise (Fessier v. Campbell, 2 Cal. 2d 638 [Cal. Sup. Ct., 1935] ; City of Red Wing v. Eichinger, 163 Minn. 54 [Minn. Sup. Ct., 1925]; State ex rel. Thompson v. City of Memphis, 147 *651 Tenn. 658, 27 A. L. R. 1257 [Tenn. Sup. Ct., 1923]; Nohl v. Board of Educ. of Albuquerque, 27 N. M. 232, 16 A. L. R. 1085 [N. M. Sup. Ct., 1921]). Indeed, 50 years ago, in Nohl (supra) the court recognized the concept, reaffirmed in Matter of Teachers Assn. (34 A D 2d 351, supra), that group insurance for teachers enabled the Board of Education to procure better teachers and, therefore, was conducive to the proper conduct of public schools. Likewise, in State ex rel. Thompson v. City of Memphis (supra) the Tennessee court stated that if group insurance is beneficial to private employees, why not apply the same concept to public employees of municipalities.
It is equally clear that a municipality may contract with a nonprofit membership corporation under article 9-C of the Insurance Law, and it is conceded that the teamsters do not qualify as an article 9-C nonprofit membership corporation. This, of course, is one of the reasons for the Comptroller’s opinion. Thus, the practical implication of the law in this and other States is that the town can directly contract with an insurance company to provide these medical, surgical and hospital services which are for the benefit of our employees yet cannot provide through a third party these same benefits to these same employees by payment into the trusteed Taft-Hartley welfare plan. Public policy provisions and q. reasonable interpretation of the applicable statute compel this court to reject this result.
n
POLICY
It is the stated public policy of this State in both the private (Labor Law, § 700) and public (Civil Service Law, § 200, more commonly referred to as the Taylor Act) sector to encourage and promote collective bargaining agreements between employers, both private and public, and their employees. Pursuant to this, the town and the teamsters collectively bargained and agreed upon payment. It is also the recognized policy of this State that article 3-A employee welfare funds are of great benéfit to the employees and their families. These funds affect the welfare of millions of people and the Legislature has specifically found that they are in the public interest (Insurance Law, § 37). An employee welfare fund set up under article 3-A (§ 37) specifically includes the trusteed funds such as this which furnish employee benefits through the purchase of insurance. It is conceded that the teamsters have a duly established and administered trusteed employee welfare fund pursuant to article 3-A (§37) and it is designed to, and in fact does, provide insurance coverage to its employee members. Of course, an article 3-A *652 plan is subject to audit by the State Insurance Department pursuant to the terms of the article.
Article 3-A became the law of this State in 1956. At that time, the whole concept of public employer-employee relationships and public employee unions was in its embryonic stage. The Taylor Law came along in 1967 and brought with it a whole new approach to public employer-employee relations. It is well settled that the provisions of the Taylor Law must be applied liberally to effectuate its public benefit purpose (Matter of Civil Serv. Empl. Assn. v. Helsby, 31 A D 2d 325, affd. 24 N Y 2d 993; Leed v. Nickerson, 63 Mise 2d 756, supra).
While the Taylor Law has been the subject of considerable commentary and criticism, there is no argument that the public employer must negotiate collectively with a recognized or certified employee organization to determine the terms and conditions of employment (Civil Service Law, § 204, subd. 2). This court has determined that medical, dental and life insurance benefits are a term and condition of employment and part of the total compensation package. Pursuant to the admonitions of the Taylor Law, the parties negotiated collectively over these terms and conditions. They agreed to make these payments and the town should be held to its agreement. Contractual agreements between a municipality and a union representing its employees are looked upon with favor by the courts unless sufficient constitutional or statutory objection is shown (Lecci v. Nickerson, supra; Hoar v. City of Yonkers, 295 N. Y. 274; Underhill v. Valentine, 267 App. Div. 778). This is particularly so when the policy provisions inherent in the Taylor Law are interpreted in conjunction with the stated public benefit purpose of article 3-A of the Insurance Law. The end result of interpretation must be to sanction an agreement such as this.
If is well settled that all .statutes must be construed to further the purpose of their enactment (McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 96; Matter of Blatnicky v. Ciancimino, 1 A D 2d 383, affd. 2 N Y 2d 943; McKay v. Trustees of District 2, 35 A D 2d 556 [2d Dept., 1970]). It is equally well established that a statute cannot be construed in a manner which would tend to sacrifice or prejudice the public interest (McKinney’s supra, Statutes, § 152). The Legislature has already specifically determined that employee welfare funds are in the public interest (Insurance Law, art. 3-A, § 37). From a reading of the Taylor Law provisions and the Insurance Law, the court can only conclude that the public interest requires that an *653 agreement to provide for the welfare and public interest of employees be given its intended effect.
Although the point has not been raised by the parties, it could be argued that since a municipality has the power to directly contract with an insurance company to provide these benefits to its employees, it does not have to or need to contribute to a union welfare fund to provide indirectly what it could do directly. The. simple answer to this argument is that it does not have to contract with a union to provide for medical, dental and life insurance in this fashion. Collective bargaining agreements are made at arm’s length, often after protracted and at times acrimonious negotiations. The parties hammer out a mutually acceptable agreement. Nothing says that a municipality must provide benefits in this way. The court is simply saying that it can provide benefits in this way if it decides to agree to do so. Numerous factors, not the least of which is cost, will determine whether they agree. Once they agree, however, they should not repudiate that agreement, particularly where, as in this case, it would result in a real detriment to the other party.
It is entirely possible that in a given factual situation a court may invalidate a contract between a municipality and a union that is so overreaching in its provisions as to be totally unrelated to the costs incurred by the trustees of the plan. However, that hypothesis is not before the court.
in
POWER
Can a municipality do such a thing as contract to make payments to a union welfare fund? There is analogous precedent that indicates that it can, and public policy would seem to favor it. Further, the State Constitution (art. IX, § 2, subd. [c], par. [1]) provides that, under the home rule power to enact local laws, a town may enact a law which regulates the powers, duties, qualifications, number, mode of selection and removal, terms of office, compensation, hours of work, protection, welfare and safety of its officers and employees. Insurance benefits such as those furnished here are a form of compensation and are intimately related to the welfare of its employees. There is no indication that any local laws were adopted for this purpose from the record but if the town has the power to adopt a local law to provide for it, it should also be able to contract for it. What such a constitutional provision does indicate is that the power to provide for its employees does reside in the municipality. There are similar provisions relating to the power of *654 the town to do this in sections 10 and 50 of the Municipal Home Rule Law.
It could also be argued that the express provisions of the Insurance Law (art. 3-A, § 37-a, subds. 6, 7) could be construed to bring a municipal corporation within the definition of the term “employer”. “Employer” is defined as “all persons part or all of whose employees or members are covered by an employee welfare fund.” The term “person” is defined as “ all individuals (acting alone or in representative capacities), partnerships, associations, corporations, labor unions and other entities.”
A ease could be made that “ other entities ” would include a municipality. The court feels that while a construction of other statutes and their policy provisions would justify the payments by the town to the union welfare fund, nevertheless, at the time this portion of the statute was written and adopted (1957), it was not the legislative intent to include municipal corporations. This court suggests that future legislative sessions address themselves to this question. While a court can interpret and construe statutes, the court cannot and should not judicially legislate. (McKinney’s Cons. Laws, of N. Y. Book 1, Statutes, § 73.)
Finally, the argument of the town that no notice of claim was ever filed is rejected. The town was originally a party plaintiff in this action, and it was not until January of 1971 by an order of this court dated February 16, 1971, Sliekin, J., that the town was made a party defendant (but, see Town Law, § 65, subd. 1). In any event, the history of this litigation prevents the town from raising this defense. To permit the town to contract to pay, to subsequently meet and promise to make payment to the union trust fund, and to bring an action to determine the rights of the parties and then to raise this defense after the complaint was filed by it as one of a group of joint and several plaintiffs, would be unconscionable.
In conclusion, analogous precedent, public policy and statutory authority dictate that this motion be granted.