Justice Sotomayor,
concurring.
The Court today interprets the counterclaim set forth in 21 U. S. C. § 355( j)(5)(C)(ii)(I) to permit generic manufacturers to force brand manufacturers to “correct” inaccurate use codes. While I too find the counterclaim not “free of ambiguity,” ante, at 412,1 join the Court’s opinion because I agree this is the most sensible reading in light of the existing regulatory scheme. I write separately to add the following observations.
I
I first underscore that the counterclaim can only lessen the difficulties created by an overly broad use code; it cannot fix them. The statutory scheme is designed to speed the introduction of low-cost generic drugs to market. See ante, at 405 (citing Eli Lilly & Co. v. Medtronic, Inc., 496 U. S. 661, 676 (1990)). To that end, the statute provides for the rapid approval of a drug that a generic manufacturer seeks to market for unpatented methods of use. The manufacturer need only submit an abbreviated new drug application (ANDA) with a section viii statement and a proposed label that “carves out” from the brand manufacturer’s label any patented methods of use. See ante, at 406. So long as the use code is not overly broad (and all else is in order), the Federal Food and Drug Administration (FDA) may approve the application without requiring any further steps relating to the patent, and the generic drug may reach the public without undue delay. See ibid.
*427 An overly broad use code “throws a wrench” into that scheme. Ante, at 419. The reason why is simple: FDA relies on use codes in determining whether to approve an ANDA, but it refuses to evaluate the accuracy of those use codes. See ante, at 406-407. Thus, if the use code overlaps with the generic manufacturer’s proposed carve-out label (i e., if the use code is overly broad), FDA will not approve an ANDA with a section viii statement. See ibid.
After today’s opinion, the generic manufacturer can respond to this situation by taking the following steps: submit an ANDA with a paragraph IV certification (which requires a proposed label materially identical to the brand manufacturer’s label, see ante, at 425), wait for the brand manufacturer to institute suit, file a counterclaim, litigate the counterclaim, and, if successful in securing the correction of the use code, return to the start of the process and do what it always wanted to do — file an ANDA with a section viii statement and a carve-out label.
The problem with this process is twofold. First, it results in delay and expense the statutory scheme does not envision. Second, there is no guarantee the process will work. It depends on the brand manufacturer initiating paragraph IV litigation, but it is not obvious the brand will have any incentive to do so. In light of today’s holding, the upshot of such litigation will be the correction of the use code through the assertion of a counterclaim — an outcome that is desirable, to be sure, for the generic manufacturer, but perhaps less so for the brand manufacturer.
Meanwhile, it is not clear what happens if the brand manufacturer does not file suit. FDA may approve the generic manufacturer’s application, see 21 U. S. C. § 355(j)(5)(B)(iii), “without prejudice to infringement claims the patent owner might assert when the ANDA applicant produces or markets the generic drug.” Brief for United States as Amicus Curiae 6 (hereinafter United States Brief). But the generic manufacturer, having been forced to proceed with a para *428 graph IV certification, will have secured approval to market a drug with a label materially identical to the brand manufacturer’s. That is not a position I imagine a generic manufacturer wants to be in: As the Solicitor General’s Office informed us at argument, “[i]t would be inducement of infringement to sell a product with labeling that suggests that the product be used for a patented method of use.” Tr. of Oral Arg. 24; see also United States Brief 32 (noting that in this situation, if a generic manufacturer proceeded with a paragraph IV certification, “[s]o long as the [new drug application (NDA)] holder’s patent covers some approved method of using the approved drug, the proposed labeling will be infringing” (emphasis deleted)).
In short, the counterclaim cannot restore the smooth working of a statutory scheme thrown off kilter by an overly broad use code. At best, it permits the generic manufacturer to do what the scheme contemplates it should do — file an ANDA with a section viii statement — but only after expensive and time-consuming litigation. A fix is in order, but it must come from Congress or FDA.
HH 1 — I
Precisely because the regulatory scheme depends on the accuracy and precision of use codes, I find FDA’s guidance as to what is required of brand manufacturers in use codes remarkably opaque. The relevant regulation states simply that a brand manufacturer must provide “[t]he description of the patented method of use as required for publication.” 21 CFR § 314.53(c)(2)(ii)(P)(3) (2011). The form on which brand manufacturers submit that information provides some additional detail, explaining that “[e]ach approved use claimed by the patent should be separately identified . . . and contain adequate information to assist. . . applicants in determining whether a listed method of use patent claims a use for which the .. . applicant is not seeking approval.” App. to Pet. for Cert. 214a. But it also provides that brand manufacturers *429 may “us[e] no more than 240 total characters including spaces,” id., at 213a, and elsewhere FDA acknowledges “that in some cases 240 characters may not fully describe the use as claimed in the patent,” 68 Fed. Reg. 36683 (2003); see also ibid, (indicating for this reason that use codes “are not meant to substitute for the applicant’s review of the patent”).
Indeed, in some respects we are here today because of FDA’s opacity in describing what is required of brand manufacturers; In its initial NDA filing, Novo submitted a use code for the ’358 patent that was not “overly broad”: It described narrowly the single patented method of use. App. 54-55, 99. Some years later FDA required that Novo amend its label to “[r]eplace all the separate indications” “with the following sentence: ‘Prandin is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.’” Id., at 163-164, 215. Novo then amended its use code to track the new label, id., at 482-486, explaining that the amendment “correspond[ed] with the change in labeling required by FDA,” id., at 483. Novo understood its amended use code to comply with FDA regulations, likely on the ground it pressed before us: that the regulations permit a brand manufacturer to submit for publication in the Orange Book a description of either the patented method of use or the indication (which refers to “what a drug does,” ante, at 417, n. 7). Brief for Respondents 10, 22, 48-50.
For the reasons explained by the Court, see ante, at 417, n. 7, Novo is mistaken. But the company can hardly be faulted for so thinking. The regulations also require submission of “a description of each approved method of use or indication,” 21 CFR § 314.53(c)(2)(ii)(P)(l), and the form on which brand manufacturers submit use codes requires “information on the indication or method of use for the Orange Book ‘Use Code’ description,” App. to Pet. for Cert. 213a; see also ibid, (explaining brand manufacturers should “[sjub-mit the description of the approved indication or method of *430 use that you propose FDA include as the ‘Use Code’ in the Orange Book”). Those sources at the least suggest (as Novo thought) that a method of use here is distinct from an indication and that either suffices as a use code.
Prior to enactment of the counterclaim provision, Congress considered a bill that required brand manufacturers to submit a “description of ‘the approved use covered by the [patent] claim,’ ” and that allowed a generic manufacturer to bring a civil action to correct that information. See ante, at 422. Congress rejected the bill, in part over criticism that it would encourage excess litigation.* Absent greater clarity from FDA concerning what is required of brand manufacturers in use codes, Congress’ fears of undue litigation may be realized.

See, e. g., 148 Cong. Rec. 13481 (2002) (remarks of Sen. Hatch); id., at 15433 (remarks of Sen. McCain); Office of Management and Budget, S. 812 — Greater Access to Affordable Pharmaceuticals Act (July 18, 2002) (statement of administration policy), online at http://www.whitehouse.gov/ omb/legislative_sap_107-2_S812-S (as visited Apr, 13, 2012, and available in Clerk of Court’s case file).