**GLAXO INC., Glaxo Group Limited, and Hanburys Limited, Plaintiffs,**

v.

**BOEHRINGER INGELHEIM CORPORATION and Boehringer Ingelheim Chemicals, Inc., Defendants.**

No. 3:95CV01342(GLG).

United States District Court, D. Connecticut.

Nov. 19, 1996.

Hopgood, Calimafde, Kalil & Judlowe by Dennis J. Mondolino, Jeffrey A. Hovden, Joan McGillycuddy, New York City, for Plaintiffs.

Cohen, Pontani, Lieberman & Pavane by Martin B. Pavane, Michael C. Stuart, New York City, for Defendants.

### Memorandum Decision

GOETTEL, District Judge.

Defendants Boehringer Ingelheim Corporation and Boehringer Ingelheim Chemicals, Inc. (collectively referred to as "Boehringer") have moved this Court for Partial Summary Judgment (Document # 131) in their favor on the grounds (1) that Boehringer's Abbreviated New Drug Application ("ANDA") filed under 21 U.S.C. § 355(j) does not *per se* constitute an act of infringement of Glaxo's [1] United States Patents Nos. 4,521,431 ("the 1431 patent") and 4,672,133 ("the 1133 patent"); and (2) that Boehringer has not infringed Glaxo's United States Patent No. 4,128,658 ("the '658 patent") by virtue of its prior representations that it might seek to sell its generic drug products prior to the expiration of the '658 patent.[2] After due consideration of the motion, memoranda, and exhibits, and after hearing argument of counsel, Boehringer's Motion for Partial Summary Judgment is GRANTED as to the first issue. As to the second issue, the Motion for Partial Summary Judgment is DENIED as moot, in light of the representations of Boehringer that it will not market its generic ranitidine products prior to the expiration of the '658 patent and, with the consent of the parties, we enter an injunction accordingly, subject to the terms hereinafter set forth.

---

1. Throughout the course of this litigation, we have used the term "Glaxo" to refer collectively to the plaintiffs. Technically, and plaintiff Glaxo Group Limited owns U.S. Patent No. 4,521,431 and U.S. Patent No. 4,672,133. Plaintiff Glaxo Inc. is the exclusive licensee of all three patents.

2. This motion does not address whether Boehringer's activities qualify for the exemption from infringement under 35 U.S.C.A. § 271(e)(1) (West Supp.1996). This issue is addressed in a separate motion for partial summary judgment filed by Boehringer.

*Background*

This case involves Glaxo's patent infringement challenges to the efforts of Boehringer to obtain Federal Food and Drug Administration ("FDA") approval to manufacture and sell a generic form of ranitidine hydrochloride, the active ingredient in Glaxo's anti-ulcer medication "Zantac®." In this case, Glaxo seeks to enjoin Boehringer from infringing the '658 patent ("the Form 1 patent"), and the '431 and '133 patents ("the Form 2 patents") relating to ranitidine hydrochloride. We have already determined, and Glaxo has conceded, that the drug product produced by Boehringer for purposes of its ANDA filed with the FDA does not infringe the '431 and '133 patents. At issue now is whether the ANDA itself infringes these patents by virtue of the quality control tests and specifications contained therein that potentially could permit the presence of a certain amount of Form 2 [3] in the drug products; and whether Boehringer has infringed the '658 patent by virtue of its prior representations that it is entitled to commence marketing of the drug products prior to the expiration date of the '658 patent.

We begin by recounting a brief history of Glaxo's ranitidine patents and Boehringer's efforts to obtain FDA approval for a generic ranitidine drug product.

In 1977, Glaxo applied for the '658 patent, which covers ranitidine hydrochloride and a method for producing ranitidine. As was eventually discovered, ranitidine hydrochloride exists in more than one crystalline or polymorphic form. However, at the time Glaxo applied for the '658 patent, Glaxo was unaware of more than one form, and, thus, the patent covered ranitidine hydrochloride irrespective of polymorphic form. The patent was issued on December 5, 1978, and was due to expire seventeen years later, on December 5, 1995.

In 1980, Glaxo scientists obtained a new polymorphic form of ranitidine hydrochloride, which has come to be known as "Form 2." Glaxo then sought and was eventually awarded the '431 patent for the specific crystalline Form 2, and thereafter obtained the '133 patent which claims separately the process for manufacturing Form 2. The '431 patent is due to expire in 2002, and the '133 patent in 2004. It is Form 2 ranitidine hydrochloride that is used by Glaxo in its highly successful commercial drug product Zantac®.

On April 28, 1995, Boehringer submitted to the FDA for approval its ANDA for ranitidine tablets, 150 mg. and 300 mg., with an active ingredient of polymorphic Form 1 ranitidine hydrochloride. The ANDA was submitted pursuant to the Hatch–Waxman Act's amendments to the Federal Food, Drug and Cosmetic Act ("FDCA"),[4] which allow a pharmaceutical manufacturer to seek expedited approval to market a generic version of a patented drug. 21 U.S.C.A. § 355(j) (West Supp.1996).

Under the FDCA, the FDA is responsible for determining whether a new drug product should be approved for sale to the public. 21 U.S.C.A. § 355(a) (West Supp.1996). The Hatch–Waxman Act amended the FDCA and the patent laws in certain important respects. *Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 665, 110 S.Ct. 2683, 2686, 110 L.Ed.2d 605 (1990). To enable new drugs to be marketed more quickly and cheaply and to "eliminate the *de facto* extension" of a drug patent at the end of its term, the Hatch–Waxman Act authorized the filing of abbreviated new drug applications for generic drugs that are the same as a so-called "pioneer drug" previously approved by the FDA, 21 U.S.C.A. § 355(j)(2)(A) (West Supp.1996), or that differ from the pioneer drug in certain ways, 21 U.S.C.A. § 355(j)(2)(C) (West Supp.1996). *Eli Lilly,* 496 U.S. at 676, 110 S.Ct. at 2691–92. This ANDA procedure allows the FDA to approve a generic version of a marketed drug on an accelerated basis if the generic manufacturer can demonstrate its ability to manufacture the drug to acceptable stan-

---

**3.** See discussion *infra* relating to the different forms of ranitidine hydrochloride.

**4.** The Hatch–Waxman Act, also known as The Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. 98–417, Sept. 24, 1984, 98 Stat. 1585, is codified at 15 U.S.C. §§ 68b, 68c, 70b; 21 U.S.C. §§ 301 note, 355, 360cc; 28 U.S.C. § 2201; 35 U.S.C. §§ 156, 271, 282.

dards and can establish the generic drug's bioequivalence to the brand name drug product. For safety and effectiveness, the FDA relies on its prior approval of the New Drug Application ("NDA") for the brand name drug. .

For every patent that claims the drug for which the applicant is seeking approval or that claims a use for which the applicant is seeking approval, the Hatch–Waxman Act requires that the ANDA contain one of four certifications: (1) that such patent information has not been filed (a paragraph I certification); (2) that such patent has expired (a paragraph II certification); (3) the date on which the patent will expire (a paragraph III certification); or (4) that the patent is invalid or will not be infringed by the manufacture, use or sale of the new drug for which the ANDA is submitted. 21 U.S.C.A. § 355(j)(2)(A)(vii) (West Supp.1996). *See Bristol–Myers Squibb v. Royce Laboratories, Inc.*, 69 F.3d 1130, 1131 (Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 754, 133 L.Ed.2d 701 (1996).

In its ANDA for Form 1 ranitidine, Boehringer filed a paragraph III certification as to the '658 patent, indicating that it would not market its ranitidine products prior to December 5, 1995, the date on which the '658 patent was due to expire. Boehringer further stated that, if the expiration date were extended, it would have a statutory right to sell its ranitidine products by virtue of its "substantial investment" in the products and its willingness to pay the "equitable remuneration." [5] Boehringer also filed a paragraph IV certification as to the '431 patent, indicating that its products would not infringe the '431 patent. No certification was necessary with respect to the '133 patent, a process patent.

As further required by the Hatch–Waxman Act, by letter dated May 24, 1995, Boehringer notified Glaxo of its ANDA filing, providing the factual and legal bases for its belief that its ranitidine products would not infringe the '431 patent. See 21 U.S.C.A. § 355(j)(2)(B)(i), (ii) (West Supp.1996).

On June 8, 1995, the patent provisions of the Uruguay Round Agreements Act ("URAA") became effective. For patents in force on June 8, 1995, the term of the patent was extended to the longer of seventeen years from the date of grant or twenty years from the date of filing, 35 U.S.C.A. § 154(c)(West Supp.1996), which in this case extended the '658 patent's expiration date to July 25, 1997. The URAA further created a "safe harbor" for persons who had made a substantial investment in certain "Acts," which now had become infringing because of the extension of the patent period by the URAA. 35 U.S.C.A. § 154(c)(2), (3) (West Supp.1996). Accordingly, Boehringer notified Glaxo that, as provided by the URAA, Boehringer was permitted to manufacture and sell its Form 1 ranitidine hydrochloride in this "delta" period (December 6, 1995 to July 25, 1997) by virtue of its "substantial investment" in the products and its willingness to pay Glaxo an "equitable remuneration," but further advised that it might elect not to commercialize its products until after the expiration of Glaxo's '658 patent on July 25, 1997.

Subsequently, the Federal Circuit, in *Bristol–Myers Squibb v. Royce Laboratories, Inc., supra,* held that the "safe harbor" provisions of the URAA did not permit an ANDA applicant seeking to market a generic version of a patented drug to make, use or sell that generic drug during the "delta" period. Thereafter, Boehringer confirmed that it would not market its generic Form 1 ranitidine hydrochloride products until July 25, 1997, when Glaxo's '658 patent expires, absent legislation authorizing it to do so.

*Discussion*

I. *Whether Boehringer's Filing of its ANDA Constitutes a Per Se Act of Infringement of Glaxo's '431 and '133 Patents*

■ The first issue presented by Boehringer's Motion for Partial Summary Judg-

---

5. As discussed *infra,* the Uruguay Round Agreements Act ("URAA"), Pub.L. 103–465, 108 Stat. ·4809, approved òn December 8, 1994, extended the term of patents in force prior to the date that is six months after the date of the enactment of the URAA. 35 U.S.C.A. § 154(c)(1) (West Supp. 1996). This Act had been passed by Congress prior to Boehringer's filing its ANDA, but did not become effective until several months after Boehringer's filing.

ment involves the interplay between the patent laws and the Food and Drug Administration's approval of applications for the sale to the public of a generic version of a previously patented drug.

As the Supreme Court noted in the *Eli Lilly* case, the abbreviated new drug application provisions incorporate "an important new mechanism designed to guard against infringement of patents relating to pioneer drugs," *id.* at 676–77, 110 S.Ct. at 2692, that being the requirement that the ANDA contain one of the four certifications discussed above. These certifications are significant in that they determine the effective date for approval of the ANDA and thus the date on which marketing of the generic drug can commence. *Id.* at 677, 110 S.Ct. at 2692.

Additionally, if an applicant submits an ANDA that contains a paragraph IV certification, the applicant must give the patent owner notice of the certification, as Boehringer did in this case. 21 U.S.C.A. § 355(j)(2)(B) (West Supp.1996). The statute then creates an act of infringement, albeit an "artificial" one, which allows the patent owner to challenge the certification — i.e. to assert *inter alia* that the commercial manufacture, use or sale of the new drug would infringe its patent. 35 U.S.C.A. § 271(e)(2) (West Supp.1996); *Eli Lilly,* 496 U.S. at 678, 110 S.Ct. at 2692–93. The patent owner has forty-five days in which to initiate a lawsuit for infringement. If the patent owner files such a suit, the FDA cannot approve the ANDA until the court rules that the patent is not infringed or until the expiration of thirty months, whichever occurs first. *See* 21 U.S.C.A. §§ 355(c)(3)(C), 355(j)(4)(B)(iii) (West Supp.1996); *Eli Lilly,* 496 U.S. at 677–78, 110 S.Ct. at 2692–93.

Glaxo now claims that Boehringer's filing of its ANDA for generic Form 1 ranitidine tablets constitutes a *per se* act of infringement of the Form 2 patents in that the quality control specifications set forth in the ANDA have a limit of detection for Form 2 of 1% for the active drug substance in the

raw drug product and 4% for the tablets. (Counsel for Boehringer explained at oral argument that the latter is higher because excipients introduced during the tableting process make it more difficult to detect small quantities of Form 2). Glaxo argues that, because Boehringer is seeking approval to market a drug that *may* contain up to 1% (or 4%) Form 2, the ANDA itself constitutes infringement of the Form 2 patents regardless of what tests on the actual drug product reveal and regardless of whether Boehringer ever sells an ounce of product.

Boehringer responds that its ANDA relates solely to Form 1 and, therefore, it cannot be held to infringe the Form 2 patents. Boehringer points out that Glaxo has conceded that its '431 patent is not infringed by pure Form 1 ranitidine hydrochloride and that its '133 patent is not infringed by a process for making pure Form 1 that does not also produce Form 2 at any stage of the process. Further, Boehringer argues that the quality control specifications set forth in its ANDA[6] are required by the FDA to ensure the quality of each drug lot before it is released. Boehringer asserts that these are quality control or identity tests designed to ensure that Boehringer's product meets an established product specification, not tests for patent infringement. Moreover, Boehringer asserts that there is no requirement that the ANDA contain an infringement test. Finally, Boehringer argues that infringement should be measured by the product itself which, as Glaxo has conceded for purposes of the summary judgment motions, does not infringe the Form 2 patents. (*See* Order of October 7, 1996, on Boehringer's Motion for Partial Summary Judgment).

In ruling in favor of Boehringer on this issue, we draw heavily from the opinion of the Honorable Terrence W. Boyle, United States District Judge for the Eastern District of North Carolina, in the case of *Glaxo Inc. v. Novopharm Limited,* 931 F.Supp. 1280 (E.D.N.C.1996), *appeal pending.* In that case, Judge Boyle was faced with a

---

6. Boehringer's ANDA states that the ranitidine hydrochloride drug substance must conform to both the infrared spectrum and the x-ray powder diffraction pattern of Form 1 in order to be released by Quality Control, and the drug product (*i.e.* the tablets) must conform to the x-ray powder diffraction pattern of Form 1 to be released.

similar legal challenge by Glaxo to the ANDA filed by Novopharm for the manufacture of a generic ranitidine product. As here, Glaxo contended that because the substance Novopharm sought to manufacture under its ANDA might *hypothetically* allow for the presence of Form 2, the ANDA itself constituted an act of infringement. *Id.* at 1285.

Judge Boyle began his analysis of this issue by citing 35 U.S.C.A. § 271(e)(2) (West Supp.1996), which provides in relevant part:

It shall be an act of infringement to submit—

(A) an [ANDA] ... for a drug claimed in a patent ...

. . . .

if the purpose of such submission is to obtain approval ... to engage in the commercial manufacture, use, or sale of a drug ... claimed in a patent ... before the expiration of such patent.

Citing *Eli Lilly,* 496 U.S. at 676, 110 S.Ct. at 2691–92, Judge Boyle held that nothing in this section alters the substantive law of patents, which requires Glaxo to prove infringement by a preponderance of the evidence — that is, that the defendant's product will more probably than not read upon the patent. 931 F.Supp. at 1286. He held that "it is not enough to suggest that the accused product *may* be infringing." *Id.* (original emphasis). As the Federal Circuit held in *Bristol–Myers Squibb,*

[s]ection 271(e)(2)(A) makes it possible for a patent owner to have the court determine whether, if a particular drug *were* put on the market, it *would* infringe the relevant patent. If the court determines that ... infringement *would* occur, and that therefore the ANDA applicant's paragraph IV certification is incorrect, the patent owner is entitled to an order that FDA approval of the ANDA containing the paragraph IV certification not be effective until the patent expires.

69 F.3d at 1135 (original emphasis). Thus, the relevant test according to the Federal Circuit in *Bristol–Myers Squibb* is whether Boehringer's drug, if it were put on the market, would infringe Glaxo's Form 2 patents.

Relying on this language, Judge Boyle determined that

■f the Court cannot conclude that the accused pharmaceutical product *would* infringe the relevant patent, it is left with what is at best a hypothesis that the product *might* be infringing. The patent owner's unproven assertion—which is just a guess—cannot warrant invocation of the Court's injunctive powers.

931 F.Supp. at 1286 (original emphasis). We agree.

Judge Boyle also suggested that this conclusion is mandated by scientific reality. *Id.* It is impossible, he noted, for an accused infringer to disprove absolutely the existence of a substance such as Form 2 in its product, for no known practical scientific method can readily account for every last molecule of Form 2 in the allegedly infringing pharmaceutical product. Rather, the presence of a substance can only be excluded up to the relevant limits of detection. He held that the patentee bears the burden to prove the presence of the patented product within the limits of detection of an accurate scientific quantification method. *Id.* Judge Boyle ruled that Glaxo had failed to establish the existence of Form 2 in Novopharm's product was even a reasonable possibility. *Id.*

■ Here, Glaxo has conceded that Boehringer's product does not contain Form 2. Glaxo can only hypothesize that Boehringer's ranitidine tablets may in the future contain Form 2. We hold as a matter of law that Glaxo cannot meet its burden of proving infringement solely on the basis of quality control specifications contained in an ANDA. Boehringer sought approval only for Form 1, and the product that it has manufactured to date for purposes of its ANDA submission has failed to reveal the presence of Form 2. A quality control test set forth in the ANDA cannot form the basis for establishing infringement.

That is not to say, however, that Glaxo is left without a remedy. If, indeed, Boehringer commences the manufacture and distribution of generic ranitidine tablets and it is

determined by Glaxo that they contain Form 2, Glaxo may bring an infringement action against Boehringer. In that event, Boehringer cannot stand behind its quality control specifications and assert that because the tablets being marketed contained less than 4%[7] Form 2 ranitidine hydrochloride, the tablets do not infringe the '431 patent for Form 2.

In so ruling, the Court is cognizant of Glaxo's appeal of Judge Boyle's decision, now pending before the Federal Circuit. Indeed, Glaxo informally sought a stay of this litigation pending the Federal Circuit's decision in the *Novopharm* case. This request, however, is denied. Accordingly, this Court GRANTS Boehringer's Motion for Partial Summary Judgment on this issue without prejudice to either party's seeking reconsideration after the Federal Circuit has ruled on the *Novopharm* appeal.

II. *Whether Boehringer Has Infringed the '658 Patent by Virtue of Its Prior Statements that It Might Seek to Market its Generic Ranitidine Products During the Delta Period*

■ The second issue presented by this motion for partial summary judgment is whether Boehringer has infringed the '658 patent by virtue of its prior statements that it might seek to market its generic ranitidine products during the "delta" period, prior to the extended expiration date of Glaxo's '658 patent.

As noted above, when Boehringer initially filed its ANDA, it certified that it would not market its generic ranitidine hydrochloride prior to the expiry of Glaxo's '658 patent on December 5, 1995. However, it also added a caveat that if the expiration date were extended by the URAA, Boehringer would have a statutory right to sell the product in question by reason of its substantial investment in the products and its willingness to make equitable remuneration to Glaxo. When this date was extended by the URAA, Boehringer then notified Glaxo to the effect that it was entitled to market its products during the "delta" period but indicated that it might

elect not to do so. Boehringer reiterated this assertion in its Fifth Affirmative Defense and Fourth Counterclaim in this litigation.

However, in *Bristol–Myers Squibb,* the Federal Circuit held that the "safe harbor" provisions of the URAA did not apply to generic drugs. Accordingly, by Order dated December 12, 1995, this Court ordered Boehringer to dismiss its Fifth Affirmative Defense and Fourth Counterclaim if *certiorari* were denied from the decision of the United States Court of Appeals for the Federal Circuit. The Supreme Court denied *certiorari* on January 9, 1996, and accordingly, Boehringer by motion withdrew its Fifth Affirmative Defense and Fourth Counterclaim.

Since Boehringer has filed a paragraph III certification as to the '658 patent, it is precluded from receiving final FDA approval until the expiration of the '658 patent on July 25, 1997. Boehringer has expressly agreed that it will not market its generic ranitidine products prior thereto.

Boehringer argues that this issue is now moot in light of its agreement not to market its generic products prior to the expiration of the '658 patent and its withdrawal of this affirmative defense and counterclaim. Glaxo contends that it should be entitled to an injunction prohibiting it from selling its generic ranitidine products prior to July 25, 1997. At oral argument, counsel indicated that Boehringer would not object to the entry of such an injunction.

Accordingly, this Court hereby enjoins Boehringer from selling to the public its generic ranitidine hydrochloride products prior to July 25, 1997, absent legislation that would allow it to market these generic products. This ruling is without prejudice to Boehringer's seeking reconsideration if the Federal Circuit's holding in *Bristol–Myers Squibb* is overruled either by Federal legislation or by controlling, precedential case law.

*Conclusion*

For the reasons set forth above, this Court GRANTS in part Defendants' Motion for

---

7. The Court expresses no opinion as to the correct level of detection of Form 2 — *i.e.,* the amount of Form 2 that would constitute infringement.

**476**

Partial Summary Judgment and holds as a matter of law that Boehringer's ANDA does not *per se* infringe Glaxo's '431 and '133 patents. The Court DENIES AS MOOT Defendants' Motion for Partial Summary Judgment as to whether Boehringer has infringed the '658 patent by virtue of earlier representations that it might market its generic products prior to the expiration of the '658 patent, and further enjoins Defendants from selling their generic ranitidine hydrochloride products prior to the expiration of the '658 patent absent a change in the legislation or controlling caselaw which would allow Defendants to do so.

**So Ordered.**